## J. C. McKnight et al., Appellees, v. S. P. Drake et al., Appellants.

1. TRUSTS—*what essential to establish, in favor of partnership.* In order to create a resulting trust in favor of a partnership the land must have been purchased with partnership funds and used for partnership purposes. A resulting trust cannot be created by a contract or agreement made between the parties, and no payment made will create a resulting trust unless the transaction is such at the moment the title passes that a trust will result therefrom.

2. APPEALS AND ERRORS—*when costs of printing will not be taxed.* If cross-errors are assigned apparently in good faith, the fact that they were subsequently withdrawn will not justify the court in taxing the costs of printing a brief and argument filed in opposition to such cross-errors.

Bill for accounting. Appeal from the Circuit Court of Moultrie county; the Hon. W. G. COCHRAN, Judge, presiding. Heard in this court at the May term, 1907. Reversed and remanded with directions. Opinion filed June 11, 1908. Rehearing denied November 19, 1908.

HARBAUGH & THOMPSON, for appellants.

HUGH CREA, HUGH HOUSUM, and EDWIN J. MILLER, for appellees.

MR. PRESIDING JUSTICE BAUME delivered the opinion of the court.

The original bill of complaint of J. C. McKnight, appellee herein, alleges that in the year 1900 C. W. Brown, Joseph Stocks, A. R. Pifer, S. P. Drake, L. G. Hostetler and appellee entered into a partnership under the firm name of Stocks, Pifer & Co., for the purpose of prospecting for coal and obtaining coal leases in the vicinity of Lovington; that Stocks and Pifer had each a one-fourth interest in said partnership and Hostetler, Drake, Brown and appellee each a one-eighth interest therein; that the firm sank a prospect shaft on land belonging to Hostetler and located a stratum of coal nine feet in thickness, and thereafter secured the

right by lease to mine coal in about five thousand acres of land; that one Byron Cheever owned a tract of land adjacent to the village of Lovington containing 104.65 acres, which land said Cheever refused to lease or sell to the firm; that thereafter, on February 21, 1901, said Cheever was induced to sell and convey said land to one W. C. Trabue for $10,500 and that said Trabue paid for said land by giving his check on the Hardware Bank of Lovington, which bank was owned by Drake & Hostetler; that although the deed to the land was taken in the name of Trabue the land was in fact purchased for the firm of Stocks, Pifer & Co., who paid the consideration therefor; that appellee offered to pay to the firm the sum of $1,312.50 as his share of the purchase price of the land, but was assured by Stocks, Pifer, Drake and Hostetler, that he could pay his proportion at a later date and that his interest in the said land and partnership would remain the same; that said Trabue thereafter conveyed said land to Stocks, Pifer, Drake and Hostetler. The bill further alleges that in September, 1901, said partnership organized a corporation known as the Moultrie County Coal Company, for the purpose of taking over the assets of the partnership and operating a coal mine; that the capital stock of said corporation was fixed at $150,000; that thereafter, on May 15, 1902, the capital stock of said corporation was decreased to $80,000 divided into 800 shares of the par value of $100 each, and the partnership assets of the firm of Stocks, Pifer & Co. were then sold, assigned and transferred to said corporation for $40,000 of its paid up stock, which paid up stock was then ordered to be issued to the several members of the partnership as follows: Pifer ninety shares, Stocks ninety-four shares, Hostetler ninety-two shares, Drake sixty-seven shares, Brown twenty-seven shares, and appellee twenty-seven shares, making a total of 400 shares, and that the remaining shares were to be retained as treasury stock, and the same was afterward placed on the market and sold at par; that in

said transfer of the assets of said firm to said corporation, the tract of land purchased from Cheever was valued at $16,000, and the tract of land owned by Hostetler, upon which the prospect shaft was sunk, was valued at $2,500. The bill further alleges that appellee objected to and protested against the division of the 400 shares of stock as above set forth for the reason that said division was not equitable; that appellee was entitled to fifty shares of said stock, except that for the land owned by Hostetler, which was turned into the corporation at $2,500, appellee agreed to contribute his one-eighth part thereof or $312.50, which would have entitled appellee to forty-six and seven-eighths shares, subject to the payment by him of $1,312.50, being one-eighth of the purchase price of the Cheever tract of land; that there was a profit in the sale of the Cheever tract of land to the corporation of $5,500, appellee's share of which profit is $687.50; that appellee is advised that the Moultrie County Coal Company has entered into an agreement to transfer all of its property to a corporation known as the Lovington Coal Mining Company. The bill prays for an accounting as to the business of the co-partnership, and that shares of the value of $687.50 of the capital stock of the Moultrie County Coal Company may be declared to be due appellee from his co-partners, Hostetler, Stocks, Pifer and Drake and said corporation, or in case the said shares of stock are sold that that amount of money be decreed to be paid appellee. In his amended bill appellee alleges that since the filing of his original bill the Moultrie County Coal Company has sold and transferred all of its property to Cyrus A. Potts and Charles A. Clark, who in turn conveyed the same to the Lovington Coal Mining Company; that said transfers were made while appellee's rights and claims were *lis pendens* and that the last named corporation has placed a trust deed for the sum of $500,000 upon all of the property formerly owned by the co-partnership. The amended bill prays additional relief which it is

not necessary to recite in detail. After answers filed by the several defendants and the filing by appellee of his replications thereto, the cause was referred to the master in chancery and was heard by the chancellor upon the proofs reported by the master. The court found that the tract of land sold by Cheever to Trabue was purchased for the partnership and was sold to the Moultrie County Coal Company at a profit of $5,000, and that appellee should have paid one-eighth part of the purchase money therefor and that he offered to do so; that appellee is entitled to one-eighth part of the profits of the sale of said land to said corporation, being $687.50, and that Hostetler, Drake, Stocks and Pifer, appropriated said profit to their own use and should account to appellee therefor; that appellee should be charged with interest on one-eighth of the purchase price of said land from February 27, 1901, to May 17, 1902, at the rate of five per cent. and also with $100 paid by Byron Cheever to appellee, as commission for effecting the sale, and that he should be credited with $50, being one-eighth of the amount deducted from the purchase price of the land by reason of the payment of rent therefor in advance to said Cheever; that the Moultrie County Coal Company set apart twenty-seven shares of its capital stock for appellee, one of which shares of stock was transferred by appellee to appellant Hostetler, and that the remaining twenty-six shares of stock are undisposed of and appellee had refused to accept the same; that there was no equity in appellee's amended bill touching the relief therein prayed against the Moultrie County Coal Company, the Lovington Coal Mining Company, Cyrus A. Potts, Charles A. Clark and Alexis R. Montgomery, trustees, and the same should be dismissed as to said parties. The decree directs that Pifer, Stocks, Hostetler and Drake account to appellee for his one-eighth of the profits derived from the sale of the Cheever land, and fixes the amount due to appellee upon such accounting at $687.31 and said Pifer, Stocks, Hostetler and Drake were ad-

judged to pay one-half of the cost of the proceeding, except the sheriff's costs. From this decree Joseph Stocks, L. G. Hostetler and S. P. Drake have appealed to this court.

The bill is framed upon the theory that the purchase by Stocks, Pifer, Drake and Hostetler of the Cheever tract of land under the circumstances alleged created a resulting trust in favor of the partnership of Stocks, Pifer & Co., and it is insisted on behalf of appellee McKnight that the evidence in the record supports such theory.

It is well established that in order to create a resulting trust in land in favor of a partnership, the land must have been purchased with partnership funds and used for partnership purposes (Robinson Bank v. Miller, 153 Ill. 245); that a resulting trust cannot be created by a contract or agreement made between the parties (Mayfield v. Forsythe, 164 Ill. 32; Brennaman v. Schell, 212 Ill. 356), and that no payment made will create a resulting trust unless the transaction is such at the moment the title passes that a trust will result therefrom. Fuber v. Page, 143 Ill. 622; Brennaman v. Schell, *supra*. An application of these principles to the facts disclosed by the evidence in this record necessarily lead us to the conclusion that the purchase of the Cheever tract of land was not impressed with a resulting trust in favor of the partnership of Stocks, Pifer & Co.

About the year 1897 Joseph Stocks, A. R. Pifer, C. W. Brown and J. C. McKnight formed a co-partnership for the purpose of securing coal leases and mineral rights in the vicinity of Lovington, Illinois, and drilling a prospect hole for coal. Some time thereafter S. P. Drake and L. G. Hostetler were admitted into the firm as co-partners, and the interests of the several partners in the business and assets of said firm were determined to be as follows: Stocks and Pifer each one-fourth, and Brown, Hostetler, Drake and McKnight each one-eighth. Prior to the purchase of the Cheever

tract of land, as hereinafter stated, appellee Mc-
Knight had contributed the sum of $500 as his one-
eighth share of the expense incurred in procuring the
right to mine coal in about 5,000 acres of land and in
drilling a prospect hole on a small tract of land owned
by Hostetler. The prospect hole was drilled to a depth
of about 1,100 feet, at which depth a vein of coal nine
feet in thickness was supposed to be located. It was
conceived to be to the advantage of the partnership to
secure the right to mine coal in a tract of land contain-
ing 104.65 acres owned by Byron Cheever, but for
some reason personal to himself Cheever had refused
to grant such right or to sell the land to any of the par-
ties interested in the enterprise. It is impossible to
determine definitely from the evidence how McKnight
was induced to enter into negotiations with Cheever
for the purchase of the land, whether upon his own
suggestion or at the request of Pifer and Hostetler,
but however this may be, he went to Decatur, where
Cheever resided, and persuaded Cheever to authorize
him to sell the land at $100 per acre, and to pay him a
commission of $100 if a sale was effected at that price.
Thereupon, McKnight introduced to Cheever one W.
C. Trabue, as an intended purchaser of the land, and it
was arranged that Trabue, although he had no credit
at that bank, should give his personal check to Cheever
for the purchase price of the land upon the Hardware
Bank of Lovington, which was owned and conducted by
Drake & Hostetler, for $10,500 and that said bank
should pay the check, and that Trabue should there-
after convey the land to the parties in interest. Chee-
ver having rented the land for the year following the
sale, and the rent amounting to $400 having been paid
to him in advance, that amount was deducted from the
purchase price, and Trabue gave to Cheever his check
on said Hardware Bank for $10,100 which check was
thereafter paid by said bank. The Hardware Bank
also paid to Trabue $200 in payment for his services
and expenses in procuring title to the land. These sev-

eral amounts were charged by the bank to the real estate account of Drake and Hostetler. Cheever paid to McKnight $100 as his commission for effecting the sale, and McKnight retained the same as his individual property. On February 27, 1901, Trabue conveyed the said land to Stocks, Pifer, Drake and Hostetler, and shortly thereafter Pifer and Stocks each paid to the Hardware Bank one-fourth of the purchase price of said land together with the costs and expenses of procuring title thereto, and the real estate account of Drake and Hostetler was credited with the amount so paid. At the time said land was purchased the partnership of Stocks, Pifer & Co. had no funds and no assessment was thereafter made upon the members of the co-partnership to raise funds for that purpose. McKnight had full knowledge of the conveyance of the land by Trabue to Stocks, Pifer, Drake and Hostetler. He made no objection thereto and claimed no interest in the land until May, 1902. He contributed nothing to the purchase price and expenses incurred in purchasing the land, and made no offer to pay any part of the consideration until about May 15, 1902, under the circumstances hereinafter stated.

On September 12, 1901, the Moultrie County Coal Company was incorporated with a capital stock of $150,000, divided into 1,500 shares of the par value of $100 each, and the several members of the co-partnership of Stocks, Pifer & Co. became shareholders in said corporation substantially in proportion to their several interests in said partnership. At a meeting of the stockholders and directors of said corporation held on May 15, 1902, the capital stock of the corporation was decreased from $150,000 to $80,000 and a proposition by the firm of Stocks, Pifer & Co. was submitted to said corporation as follows:

"Lovington, Illinois, May 15, 1902. To the Moultrie County Coal Company: We hereby propose to the Moultrie County Coal Company to sell to said company all of the coal leases, franchises, real estate and all

other property pertaining to coal mining, held by Stocks, Pifer and Co., composed of the undersigned, for the sum of forty thousand dollars, and that we will accept in payment therefor four hundred shares of the capital stock of said company at the par value of $40,000.

> A. R. Pifer,
> C. W. Brown,
> S. P. Drake,
> J. C. McKnight,
> Joseph Stocks,
> L. G. Hostetler."

A resolution was then adopted accepting the proposition made as above and directing the secretary to accept deeds of real estate and transfers of leases and franchises and other property belonging to the firm of Stocks, Pifer & Co., and to issue to the several members of the co-partnership in consideration therefor 400 shares of the capital stock of said corporation in the proportions following: A. R. Pifer ninety-three shares, Joseph Stocks ninety-four shares, L. G. Hostetler ninety-two shares, S. P. Drake sixty-seven shares and C. W. Brown and J. C. McKnight each twenty-seven shares. The remaining 400 shares of the capital stock of said corporation were to be held as treasury stock and sold to outside parties at par for the purpose of raising funds to carry on the business of the corporation. A resolution of similar import so far as it related to the distribution of 400 shares of stock among the several stockholders and the retention of 400 shares of stock as treasury stock was introduced at said meeting by appellee McKnight and unanimously adopted. Prior to the adoption of said resolutions the question as to the valuation to be put upon the several properties to be transferred to the corporation was generally discussed among the stockholders. It was agreed that the five acres of land belonging to L. G. Hostetler upon which the prospect hole was drilled should be turned into the corporation at $2,500 and

that stock to that amount should be issued to him in payment therefor, and Stocks, Pifer, Drake and Hostetler, who held the title to the Cheever tract of land, for which they had paid $10,300 insisted that it should be turned into the corporation at $16,000, which would give them a profit on the transaction of $5,700. There is some evidence tending to show that McKnight and Brown then objected to the valuation proposed to be put upon the Cheever tract of land, and insisted that it be turned into the corporation at its cost price, with interest, or in the event that it was put in at $16,000 that they should be permitted to share in the profits in proportion to their holdings and interest in the firm of Stocks, Pifer & Co.; that some of the other members of the co-partnership finally consented that McKnight and Brown should share in the profits if they would each pay the proportionate share of the cost price of the land; that McKnight and Brown then offered to pay their said proportionate shares but were given to understand by some of the other partners that it would be unnecessary for them to make such payments, that Pifer and Stocks should take care of and carry Brown's interest in the transaction, and Hostetler and Drake should do the same for McKnight, until the matter was finally closed up, and with that understanding and agreement the resolutions heretofore referred to were proposed and adopted. Manifestly, the shares of stock of the corporation were divided among the several parties in accordance with their respective interests in the several properties involved, as follows:

|  | Cheever Land | Coal Leases | Hostetler Tract | Total |
|---|---|---|---|---|
| Pifer | $4,000 | $5,300 |  | $9,300 |
| Stocks | 4,000 | 5,400 |  | 9,400 |
| Drake | 4,000 | 2,700 |  | 6,700 |
| Hostetler | 4,000 | 2,700 | $2,500 | 9,200 |
| Brown |  | 2,700 |  | 2,700 |
| McKnight |  | 2,700 | . | 2,700 |
| Totals | 16,000 | 21,500 | 2,500 | 40,000 |

That McKnight did not consider that he had any interest in the first instance in the Cheever tract of land, is evident from the fact that at the meeting on May 15, 1902, he objected to placing a valuation on it of $16,000 upon the ground that such valuation was too high. If he had understood that the Cheever tract of land was purchased as partnership property, it could make no difference to him at what price it was sold to the corporation, because he would have been entitled to one-eighth of its selling price. On the other hand, if he had no interest in the land, as being partnership property, it would be to his advantage that it should be sold to the corporation at the lowest possible price, and thus diminish the number of shares to be issued to the actual owners in payment therefor and increase the number of shares to be divided among the other members of the partnership.

If the transaction in its inception was not impressed with a resulting trust in favor of the partnership, no agreement subsequently entered into could effect that result. In the absence of any showing that the land was purchased with partnership funds, the mere fact that prior to its purchase efforts had been made by the firm to acquire coal rights therein, and that its acquisition inured to the benefit of the firm in enabling it to better promote the purpose of the partnership, was not sufficient to establish a resulting trust in favor of the partnership. The fact that the land was owned by persons interested in the partnership who were willing to dispose of it in connection with the partnership property certainly enabled the partnership to dispose of its property to much better advantage, and it was, doubtless, in view of this consideration that McKnight negotiated for its purchase.

The conduct of McKnight in offering and voting for a resolution fixing the number of shares of the capital stock of the Moultrie County Coal Company to be received by the several stockholders in payment for the assets of the firm of Stocks, Pifer & Co., in such man-

ner as to exclude him from participation in the price at which the Cheever tract of land was to be sold, is wholly inconsistent with his present contention that he then had an interest in said land.

Having reached the conclusion that the decree must be reversed, it is not necessary to notice the cross-error assigned by appellee McKnight now remaining in the record.

Certain of the appellees have filed their brief and argument in this court in support of the ruling of the chancellor in the particulars wherein McKnight assigned certain cross-errors, which have been heretofore withdrawn, and now make their motion to tax the costs of printing such brief and argument against McKnight. As the cross-errors were evidently assigned in good faith the motion will be denied.

For the reasons heretofore stated the decree will be reversed and the cause remanded with directions to the Circuit Court to dismiss the bill for want of equity.

*Reversed and remanded with directions.*